UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

Plaintiff,

v.

Darnell Cleveland Harris,

Defendant.

Criminal No. 10-50 (RHK/FLN)

**REPORT AND RECOMMENDATION**

_____

Thomas M. Hollenhorst for the Government.
Andrea K. George for Defendant.
_____

**THIS MATTER** came before the undersigned United States Magistrate Judge on April 6, 2010 on Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [#18]. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. At the hearing, the Court received testimony from St. Paul Police Officer Jay Thompson.

The Government submitted two exhibits into evidence during the course of the hearing. Government Exhibit 1 is a color photograph of a silver four-door automobile parked in front of a light-colored house. Government Exhibit 2 is a St. Paul Police Department Incident Recall report for January 15, 2009. The Defendant submitted two exhibits after the hearing. Defense Exhibit 1 is a Mapquest print-out in the vicinity of Cook Avenue in St. Paul, Minnesota. Defense Exhibit 2 is the National Oceanic and Atmospheric Administration's Sunrise/Sunset

Calculator for January 15, 2009. For the reasons which follow, this Court recommends Defendant's motion be denied.

## I. BACKGROUND

St. Paul Officer Jay Thompson testified that on January 15, 2009 the St. Paul police received a call from a female complaintant[1] who reported that a person was sitting in a car parked in front of her house on Cook Avenue in St. Paul. The caller also reported that the person in the car had a gun. (Tr. 8-9.) Thompson testified that his K-9 unit happened to be in the vicinity, so he responded to the call. (Tr. 15.) As Thompson drove toward the scene, new information kept coming through to him via the police dispatcher. He received supplemental information that there were two people in the car, that one of them had a gun, that the female caller feared the individuals, and that she believed they were doing a drug deal. (Tr. 11.) Initially, the dispatcher reported that the driver had the gun, but later the report was that the passenger had the gun. (Tr. 11.) Thompson also received information that the car in front of the house was the only car there. The vehicle was initially described as blue and later described as silver. (Tr. 11-12, 30.)

When Thompson arrived at the residence, he saw a lone vehicle matching the caller's description parked in front of the residence. He parked next to the car, but did not block it. (Tr. 15-17.) According to the dispatch logs, Thompson arrived at a few minutes before 3 p.m.[2] (Gov't Ex. 2.) After Thompson arrived, he got out of his squad car and approached the driver of the vehicle. Thompson testified that because he was the only officer on scene, he conversed with the individuals in the vehicle for a few minutes while he waited for a back-up unit to arrive. Thompson asked the driver for identification, and identified the driver as Kevin Smith. Smith

---

[1] The complainant identified herself by name.
[2] However, Thompson testified that he arrived at approximately 4 p.m. (Tr. 16.) The Government concedes that the time was closer to 3 p.m. (Mem. Opp. at 4.)

did not have a valid driver's license. (Tr. 18, 23, 25.) The male passenger did not have identification, but orally identified himself as Darnell Harris. (Tr. 18.) At the hearing, Thompson identified the defendant as the male passenger in the vehicle. (Tr. 26.) The men told Thompson that they did not own the car, but that someone named Eastwood owned the car. (Tr. 19.) The men also told Thompson that they were parked in front of the residence because they had sent a person named Jeremy inside to bid on a painting job. (Tr. 18-19.) Thompson testified that he asked Smith and Harris if they had anything like guns, bombs, nuclear weapons or hand grenades in the car. They said no. (Tr. 19.)

Thompson testified that he spoke with the men for two or three minutes through the driver's side of the car, and that Smith and Harris were seated inside the car the entire time. (Tr. 21-22.) During the conversation, Thompson did not place the men under arrest, did not ask them to exit the vehicle, and did not tell the men they were not free to leave. (Tr. 21.) Neither Smith nor Harris asked if they were under arrest. (Tr. 21.) When St. Paul Police Officer Peter Renteria arrived at the scene, Thompson asked the driver, Smith, to get out of the car. Thompson testified that he waited until Renteria arrived to ask Smith to exit the vehicle because Thompson was concerned for his own safety as the only officer on scene. (Tr. 22.)

After Renteria walked Smith away from the car, Thompson went around to the passenger side and asked Harris to get out of the car. (Tr. 27.) Thompson testified that Harris was not under arrest when Harris got out of the car. Thompson further testified that he asked Harris to get out of the car for officer safety reasons. Thompson stated that he was worried about a gun in the front of the car. Thompson testified, "I don't want anybody to grab [a gun] and start shooting." (Tr. 27.) After Harris had exited the vehicle, Thompson again asked Harris if there were any guns in the car. Harris said no, not that he was aware of. (Tr. 27-28.) By this time,

3

another squad had arrived and Thompson had those officers watch Harris. Harris was standing in front of the vehicle. (Tr. 28.)

While Harris was being watched by the newly-arrived officers, Thompson testified," I went to the car and looked through the front passenger area. Initially I looked on the passenger side first and when I stuck my head in there I could see the butt of the gun under the front seat of the passenger." (Tr. 28.) Thompson testified that approximately one minute passed from the time that Harris had gotten out of the vehicle until the time Thompson found the gun. (Tr. 28.) At the time Thompson began to search the car, and for the duration of the initial search, Harris was not under arrest or in handcuffs, and was near the vehicle. (Tr. 28-29.) After Thompson saw the gun, he walked over to talk with Renteria. Thompson and Renteria put both Smith and Harris under arrest and in handcuffs. After taking photographs of the gun in the car, Renteria took the gun into police custody. (Tr. 28.)

## II. ANALYSIS

The police may initiate an investigatory stop if they have a reasonable, articulable suspicion that a person is engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *United States v. Gill*, 513 F.3d 836, 844-45 (8th Cir. 2008). However, an officer need only "articulate some minimal, objective justification for an investigatory stop" in order to comply with the Fourth Amendment. *United States v. Donnelly,* 475 F.3d 946, 952 (8th Cir. 2007) (quoting *United States v. Fuse,* 391 F.3d 924, 929 (8th Cir.2004)). Further, "[w]hether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *Donnelly,* 475 F.3d at 952 (quoting *United States v. Garcia,* 23 F.3d 1331, 1334 (8th Cir.1994)).

During a valid *Terry* stop, the police may briefly question the suspect under investigation. The police may also conduct a protective search for weapons if they have an articulable suspicion that the suspect is armed and dangerous. *United States v. Rowland*, 341 F.3d 774, 783 (8th Cir. 2003). The protective search doctrine is based on an officer safety rationale, and it is well-settled that the protective search may extend to a search of a vehicle – "even after un-arrested occupants have been removed from the vehicle." *Rowland*, 341 F.3d at 783 (citing *Michigan v. Long*, 463 U.S. 1032, 1051-52 (1983) ("Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect…break away from police control and retrieve a weapon from his automobile.").)

Defendant Harris argues that the gun seized here should be suppressed because Officer Thompson lacked a reasonable, articulable suspicion necessary to conduct a *Terry* stop. The Court disagrees. Based on the totality of the circumstances, the Court concludes that Officer Thompson had a reasonable, articulable suspicion to believe Harris and Smith were engaged in criminal activity. Thompson had information from a non-anonymous female complainant that two people were sitting in a car outside of the complainant's house, that the car was silver, that the car was the only vehicle in front of the house, and that one of the occupants had a gun in his lap. When Thompson arrived on scene, he was able to visually confirm all of the complainant's information with the exception of the location of the gun. Therefore, Thompson reasonably concluded that the information provided by the complainant was reliable, including the report that there was a gun in the car.

It is a violation of Minnesota law to transport a firearm in a motor vehicle unless it is unloaded and properly cased, unloaded and in the closed trunk of the vehicle, or carried in

compliance with permit requirements. Minn. Stat. § 97B.045. As both Smith and Harris repeatedly told Thompson that there were no weapons in the car, it was reasonable to believe neither had a properly permitted weapon. Thus, Thompson had a reasonable suspicion that Harris and Smith were engaged in the criminal activity of improperly transporting a firearm in violation of Minn. Stat. § 97B.045. It follows, then, that Thompson properly conducted a *Terry* stop when he asked first Smith and then Harris to exit the vehicle. Moreover, as Harris was standing near the vehicle, and was not arrested or in handcuffs, he could have broken free from police control and retrieved a weapon from the front passenger area of the car. Therefore, it was proper for Thompson to conduct a protective search of the vehicle to ensure officer safety.[3] *Rowland*, 341 F.3d at 783.

Finally, the gun was in plain view under the passenger seat of the car during Thompson's protective search. Under the plain view doctrine, an officer is permitted to seize evidence without a warrant when: "(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself." *United States v. Armstrong,* 554 F.3d 1159, 1162-63 (8th Cir. 2009), *cert. denied,* 129 S. Ct. 2805 (2009); *see Horton v. California,* 496 U.S. 128, 136-38 (1990). As Thompson was conducting a legitimate protective search at the time he saw the gun in plain view, and as the incriminating nature of the uncased gun was immediately apparent, the officers were permitted to seize the gun.

---

[3] As in *Rowland*, because Harris was not arrested, the Court need not consider whether law enforcement could have properly conducted a search incident to arrest. *Rowland*, 341 F.3d at 783; *see also Arizona v. Gant*, 129 S.Ct. 1710, 1716-24 (2009) (narrowing the search incident to arrest exception by holding that police may search the passenger compartment of a vehicle incident to a recent occupant's arrest only if it is reasonable to believe that the arrestee might access the vehicle at the time of the search or that the vehicle contains evidence of the offense of the arrest).

In sum, for the above reasons, the search of the vehicle and seizure of the gun was proper under the Fourth Amendment and the Defendant's motion to suppress must be denied.

### III. RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that the Motion to Suppress Evidence Obtained as a Result of Search and Seizure [#18] be **DENIED**.

DATED: April 21, 2010

*s/ Franklin L. Noel*
FRANKLIN L. NOEL
United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **May 5, 2010**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within fourteen days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to0 stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **May 5, 2010,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.